FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

2021 MAY -4 PM 1:30

| | |
|---|---|
| ROSELYNE LAGUILLE-BRUGMAN<br>834 SUGAR CAMP WAY<br>BROOKSVILLE, FL 34604<br><br>*Plaintiff,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>) 8:21cv1064 CEH-JSS<br>) Civil action No. _____<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, Roselyne Laguille-Brugman, widow of Cort Brugman brings this complaint Against The Federal District Court under the FTCA, 28 U.S.C. §§ 1346 (b) and 2671-2680 and 2401 (b) after SF95 denial by the US Department of Veterans Affairs, Office of General Counsel on December 18, 2020 and alleges as follows:

## PRELIMINARY STATEMENT

Cort Brugman, late husband of plaintiff, was a 66 years old, 100 % disabled Vietnam veteran, victim of Agent Orange with multiple co-morbidities, which affected his quality of life for at least the last 20 years but survived two cancers, lymphoma in 2000 and prostate carcinoma in 2017. He died in CICU on December 22, 2019 at 10:54 am at James Haley Veteran's Hospital in Tampa, Florida. Entry BP in ER on December 15th, 2019 was 133/67, pulse 102, fever 97.7.

TB9-63831
$402.00

A) There was medical departure of standard of care by Physicians Employed by the Hospital of James Haley Veteran Hospital in Tampa, Florida by failure to properly manage symptoms, diagnosis and treatment of DAH.

Diffuse alveolar hemorrhage (DAH) is a syndrome classically defined by the triad of anemia, hemoptysis, and bilateral infiltrates on chest imaging (all present). DAH can progress rapidly toward respiratory failure and death. It is paramount that critical care practitioners be familiar with the diagnosis and treatments available for this syndrome. With appropriate and timely treatment, the prognosis can be dramatically improved. Early detection followed by adequate treatment was essential. June 13, 2019 pathology report from BAL was ignored, so was code 1001 view alert from 6/26/19.

B) Cort Brugman also suffered HAI after admission in CICU, septic shock after intubation and induced coma on 12/16/19 without consent, with dangerously low BP and organ failure (anuric and anasarca), so breach of duty to provide a safe environment in CICU. Even patients with no comorbidities contract sepsis in hospitals.

Each year, at least **1.7 million** adults in America develop sepsis. Nearly **270,000** Americans die as a result of sepsis. **1 in 3** patients who dies in a hospital has sepsis according to Centers for Disease Control and Prevention. Need safer health care, think sepsis, time matters.

C) Preventable ADE (Adverse Drug Event) in CICU occurred with patient with documented allergy to penicillin.

D) The cause of his death was negligence had departures from reasonable care not occurred.

## **FACTUAL BACKGROUND**

## **COUNT I– Delayed DAH Diagnosis and treatment**

1) DAH is a medical emergency due to the morbidity and mortality associated with failure to treat the disorder promptly.

2) DAH is preventable and controllable with aggressive intervention.

3) Uncontrolled pulmonary hemorrhage can lead to death and life threatening respiratory failure.

4) Early, accurate diagnosis identifying the underlying causes and appropriate treatment are critical for management of DAH.

5) All cardinal signs of DAH such anemia, hemoptysis, falling hemoglobin, hematocrit, platelets) were present in 2019.

6) So were elevated measurements of inflammation such as sedimentation rate and C-reactive protein (CRP) and brought to doctor's attention in vain.

7) Cort Brugman had multiple stays at the VA hospital in 2019 (1/29-2/1, 2/24-3/8, 3/12-3/14, 5/8-5/10, 6/26-28, 10/1-4, 11/2-14) for the same complaints than on December 15th, i.e respiratory issues.

8) Broncho-alveolar lavage (BAL) was central to the diagnosis of DAH back in June 2019. The finding of hemosiderin-laden macrophages on cytologic examination should have alerted to the diagnosis. "Dense hyalinized fibrosis, **hemorrhage** and acellular material suggestive of fibrin" and "hemosiderin laden macrophages". A code 1001 view alert was also placed on June 26, but no follow-through.

9) There is real potential for operator error/misdiagnosis in bronchoscopies. If slides unsatisfactory where examined, further aggressive investigation should have been performed.

10) Serum antinuclear antibody, ANCAs, and glomerular basement membrane (GBM) should have been assessed to look for the underlying etiology of DAH.

11) Urinalysis should have been indicated to exclude glomerulonephritis and pulmonary-renal syndromes, serum BUN (at 40 and urea at 50, when released from VA hospital in November 2019) and creatinine should have been measured.

12) Treatment with cyclophosphamide could have been used (treats vasculitides, connective tissue disorders).

13) The treatment of DAH ranges from supportive care and withdrawal of offending drugs (Xarelto), to high dose steroids, immunosuppressants drugs and plasmapheresis.

14) It is not until November 2019 that Cort Brugman was officially diagnosed with DAH after another ER admission on 11/2/19.

15) Usual treatment consists of high-dose steroids, aminocaproic acid and supportive measures such as high positive end expiratory pressure (PEEP). In some refractory cases, immunosuppressive agents such as cyclophosphamide and rituxumab should have been administered earlier. The intrapulmonary use of recombinant factor VIIa (rFVIIa) has been reported as a treatment to stop bleeding in DAH.

(Baker, Mary S. MD; Diab, Khalil J. MD; Carlos, W. Graham MD; Mathur, Praveen MBBS)

Author Information
Journal of Bronchology & Interventional Pulmonology: July 2016 - Volume 23 - Issue 3 - p 255-258
doi: 10.1097/LBR.0000000000000286

16) Supportive care should have taken measures to maintain oxygenation (included correction of platelet and coagulation abnormalities, careful maintenance of fluid and electrolyte balance, and aggressive ventilator and oxygen support)

17) Labs for Electrolytes, CBC with differential, Coagulation studies (INR, PTT, fibrinogen, activated partial thromboplastin time), Urinalysis, ESR, and CRP were elevated and discussed with various doctors to no avail.

18) Coagulopathy wasn't addressed (reversal therapy). Nebulized tranexamic acid (1000mg, then 500 mg q8hr) should have been considered.

19) Alternatively, interventions such as an endobronchial blocker to contain the bleeding but not done until 12/17/19. It has been reported having a high success rate ( 96% ).

20) On November 14, 2019, Cort Brugman was discharged due to lack of beds with corticosteroids therapy at home without nurse assignment (infusion at home plus oral tapering and insulin sliding scale).

21) Serologic testing for ANCAs, GBM, etc. may take time to result. Ordering these during the hospitalization would have ensured that the results are available for the first follow-up clinic visit.

22) The prognosis for patients managed in the recommended ways has a mortality from 13-50%, if aggressively treated with appropriate diagnosis directed treatment.

23) His serum BUN was at 40 and urea at 50 upon discharge (toxic effects of steroids on kidneys).

24) Last dose of prednisone was administered on December 7th 2019.

25) Due to recurring dyspnea, Cort Brugman had to return to ER on December 15, 2019 at 5 p.m and finally admitted in CICU at 3: a.m

26) Chest X-ray showed " worsened patchy ground glass consolidation in right upper lobe. Improved in left upper lobe and right lower lobe. Could represent areas of pulmonary edema, pneumonia or alveolar hemorrhage. Pleural effusions with associated bilateral pleural thickening and nodularity… This could be secondary to previous asbestos exposure given right-sided calcifications".

27) In spite of earlier confirmed diagnostic in November, they proceeded to intubation and induced coma after comments "etiology not confirmed but right lung improved".

28) No consent was obtained from spouse for bronchoscopy of 12/16 and 12/17 nor intubation and induced coma.

29) Awake bronchoscopy should have been performed instead of intubation or an endobronchial blocker could have stopped bleeding.

30) Intubation can cause harm. It is counterproductive, it doesn't fix the problem and may actually cause blood accumulation in the lungs. It should be delayed and/or avoided.

Most patients are *very good* at coughing blood out of their airways. Intubation & suctioning is generally *less effective* than the patient's natural ability to clear their airway. Intubation will likely *impair* clearance of blood from the airways.

It may be safest to avoid intubation (e.g. perform bronchoscopy and/or bronchial embolization under light sedation).

Intubation may actually *destabilize* the patient by suppressing natural cough reflex.

"Seen too many patients harmed by well-intentioned physicians who wanted to "secure" the airway during hemoptysis."

— *Otis B Rickman, DO (@OtisBRickman) July 25, 2019*

The Internet Book of Critical Care is an online textbook written by Josh Farkas (@PulmCrit), an associate professor of Pulmonary and Critical Care Medicine at the University of Vermont.

31) PNH panel, anti-cardiolipin, anti-Thrombin II, lupusanticoagulant, SPEP, UPEP, plasma free light chains, mutations for factor V leiden not performed until 12/22/19 7:09 am., day of death.

Refer to resources 2018 by Marvin I. Schwarz, MD on different treatments of DAH.

Collard, HR, King, TE, Schwarz, MI, Broaddus, VC, Mason, RJ, Ernst, JD. "Diffuse alveolar hemorrhage and rare infiltrative disorders of the lung". *Murray & Nadel's Textbook of Respiratory Medicine*. 2016. pp. 1207

Lara, AR, Schwarz, MI. "Diffuse Alveolar Hemorrhage". *CHEST*. vol. 137. 2010. pp. 1164-1171. Collard, HR, Schwarz, MI. "Diffuse alveolar ". *Clin Chest Med*. vol. 25. 2004 Sep. pp. 583-92.

## COUNT II – SEPSIS/IATROGENESIS

Health care is not as safe as it should be. A substantial body of evidence points to medical errors as a leading cause of death and injury. Globally it is estimated that 142,000 people died in 2013 from adverse effects of medical treatment, 51% more than in 1990. In the United States, estimated deaths per year include:
- 12,000 due to unnecessary surgery
- 7,000 due to medication errors in hospitals
- 20,000 due to other errors in hospitals
- 80,000 due to nosocomial infections in hospitals
- 106,000 due to non-error, negative effects of drugs.

32) Based on those figures, iatrogenesis may cause as many as 225,000 deaths per year in the United States (excluding recognizable error). An earlier Institute of Medicine report estimated 230,000 to 284,000 iatrogenic deaths annually.

33) Iatrogenesis is the causation of a disease, a harmful complication, or other ill effect by many medical activity, including diagnosis, intervention, error or negligence.

34) Some iatrogenetic events are obvious, like amputation of the wrong limb, whereas others, like drug interactions, can evade recognition.

35) ICU doctors were at loss of words for possible causes of the sepsis:

- Multiple in-dwelling lines (femoral catheter, Schwan-Ganz, blood transfusions, long intubation due to over sedation, transfusions, dialysis)
- Corticosteroids increase risks of infection
- Administering of meds like penicillin when known allergy. Preventable ADE (adverse Drug Event) because the medical record was not consulted.
- Combination of prednisone and opoids
- Nosocomial infection.

36) VAP is nosocomial pneumonia found in 9–27% of patients on mechanically assisted ventilator. It usually occurs within 48 h after tracheal intubation. 86% of nosocomial pneumonia is associated with ventilation .

37) Side effects of medicine administered in ICU:

- PREDNISONE– can cause irreversible organ damage
- VANCOMYCIN – low BP, anaphylactoid reaction, indistinguishable from anaphylaxis resulting into cardiovascular collapse and death.
- PRECEDEX – low BP, low blood plasma, fluid in lungs, decreased urination, not indicated for infusions superior to 24H, interacts with anesthetic, sedatives, hypnotics and opoids.
- MIDAZOLAM – central nervous system suppressant, not supposed to be used with PRECEDEX resulting in slow breathing and death
- DOPUTAMINE, FENTANYL – 50-100 x more potent = hypoxia plus interactions with PRECEDEX
- DEXMEDETOMIDINE – low BP, post procedure bleeding, low blood oxygen, swelling, acid accumulation in body, low blood plasma
- **CEFEPIME**- "Do not use longer than you have been told. A second infection may happen.

If you are 65 or older, use cefepime with care. You could have more side effects".

**Warnings and Precautions -Hypersensitivity Reactions to Cefepime, Cephalosporins, Penicillins, or Other Drugs**

Before therapy with Cefepime for Injection USP and Dextrose Injection USP is instituted, careful inquiry

should be made to determine whether the patient has had previous immediate hypersensitivity reactions to cefepime, cephalosporins, penicillins, or other drugs. Exercise caution if this product is to be given to penicillin-sensitive patients because cross-hypersensitivity among beta-lactam antibiotics has been clearly documented and may occur in up to 10% of patients with a history of penicillin allergy. If an allergic reaction to Cefepime for Injection USP and Dextrose Injection USP occurs, <u>discontinue the drug</u>.

**Hypersensitivity to Cefepime or the Cephalosporin Class of Antibiotics, Penicillins, or Other Beta-lactam Antibiotics**

"Cefepime for Injection USP and Dextrose Injection USP is <u>contraindicated in patients who have a history of immediate hypersensitivity reactions (e.g., anaphylaxis, serious skin reactions) to cefepime</u> or the cephalosporin class of antibiotics, penicillins, or other beta-lactam antibiotics".Source : drugs.com

## **COUNT III - NURSE NEGLIGENCE**

38) Nurses owe patients an independent professional duty of care and can commit malpractice just like a physician can. Nurses perform many different types of tasks that are related to a patient's treatment. Serious nursing mistakes have been known to cause the wrongful death of a patient. Some of nursing errors were:

- failure to monitor a patient's vital signs properly (extreme low BP at 3 am on 12/22/19, coded at 10.06 am, CPR ended at 10:48 am.
- failure to timely report suspicious symptoms to physician in charge even with skeleton crew on a Sunday.
- failure to timely enter the patient's nursing record into the patient's chart (recorded on the 26th, 4 days post death)
- On 12/19/19, incident with nutrition line clog, had trouble finding replacement. Took over half an hour after 4 attempts to declog with syringe pushing by 4 different nurses.

## CONCLUSION

The 20th-century social critic Ivan Illich broadened the concept of medical iatrogenesis in his 1974 book *Medical Nemesis: The Expropriation of Health* by defining it at three levels.

1) First, clinical iatrogenesis is the injury done to patients by ineffective, unsafe, and erroneous treatments as described above.

2) Second, at another level social iatrogenesis is the medicalization of life in which medical professionals, pharmaceutical companies, and medical device companies have a vested interest in sponsoring sickness by creating unrealistic health demands that require more treatments or treating non-diseases that are part of the normal human experience, such as age-related declines. In this way, aspects of medical practice and medical industries can produce social harm in which society members ultimately become less healthy or excessively dependent on institutional care. He argued that medical education of physicians contributes to medicalization of society because they are trained predominantly for diagnosing and treating illness, therefore they focus on disease rather than on health.

3) Third, cultural iatrogenesis refers to the destruction of traditional ways of dealing with, and making sense of, death, suffering, and sickness. In this way the medicalization of life leads to cultural harm as society members lose their autonomous coping skills. It is worth noting that in these critiques "Illich does not reject all benefits of modern society but rejects those that involve unwarranted dependency and exploitation.

Since at least the time of Hippocrates, people have recognized the potentially damaging effects of medical intervention. "First do no harm" (*primum non nocere*) is a primary Hippocratic mandate in modern medical ethics. Iatrogenic illness or death caused purposefully or by avoidable error or negligence on the healer's part became a punishable offense in many civilizations. With the development of scientific medicine in the 20th century, it could be expected that iatrogenic illness or death might be more easily avoided.

There are four elements to this negligence action:

1. duty: the defendant had a duty to others, including the plaintiff, to exercise reasonable care,
2. breach: the defendant breached that duty through an act or culpable omission,

3. damages: as a result of that act or omission, the plaintiff suffered an injury, and
4. causation: the injury to the plaintiff is a reasonably foreseeable consequence of the defendant's act or omission.

Certain jurisdictions, also provide for breaches where professionals, such as doctors, fail to warn of risks associated with medical treatments or procedures. Doctors owe both objective and subjective duties to warn; and breach of either is sufficient to satisfy this element in a court of law.

Cort Brugman's request for help, further investigation of his health issues were ignored. The delayed diagnosis, the failure to order necessary diagnostics, the medical interactions and/or side effects and hospital induced sepsis, brought prejudice which constitute a conscious disregard for human life and failure to fulfill their sworn duty.

No amount of damages can alleviate pain and suffering (physical and mental) through the last 22 years and especially the week of 12/15-22, 2019 nor can bring Cort Brugman to life.

How much money is a life worth? Can we put a value on human's life? Life is unmeasurably valuable. Economists value a statistical life to $10 million.

## JURISDICTION AND VENUE

**1.    This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States.**

**2.    This court has personal jurisdiction over the defendant's Department of Veterans Affairs because the place of business of James A. Haley Veterans Hospital and Clinics (JAHVH) is located in this state.**

**3.    Venue is proper pursuant to 28 U.S.C. §1391(b) because the events giving rise to the allegations in this complaint occurred in this district.**

## PRAYER FOR RELIEF

Plaintiff respectfully prays for the following relief:

A) An order awarding the costs, expenses incurred in these proceedings pursuant to 28 U.S.C. § 2412 and

B) Loss of companionship, protection and income after 22 years of marriage and

C) Compensation for emotional pain and suffering and

D) Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Roselyne Laguille-Brugman
Roselyne Laguille-Brugman
834 Sugar Camp Way
Brooksville, FL 34604
Phone: 352-848-3095
Brugman4@aol.com

*Pro Se litigant for plaintiff*

Dated : May 4th, 2021